CHUNG, MALHAS & MANTEL, PLLC
Edward C. Chung, WSBA 34292
1037 NE 65th Street Suite 80171
Seattle, Washington 98115
Phone: (206) 264-8999
Facsimile: (206) 264-9098
*Local Counsel for Plaintiff(s)*

IMPRESA LEGAL GROUP
George Kostel, Esq. (*pro hac vice admission forthcoming*)
Rich Kelsey, Esq. (*pro hac vice admission forthcoming*)
3101 Wilson Blvd., Ste. 500
Arlington, VA 22201
Tel.: (703) 842-0660

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF WASHINGTON (SEATTLE)**

| | |
|---|---|
| MONTE PRINGLE, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>EVAN SUTTON; HANNAH KRIEG; HANNAH SAUNDERS; SOUTHEND INDIVISIBLE INC.; SEATTLE INDIVISIBLE; THE PROTEUS FUND; THE OPEN SOCIETY FOUNDATION; AND ABC CORPS. 1-100,<br><br>Defendants. | Case No. 2:26-cv-04265<br><br>COMPLAINT—CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

**TO:** The United States Court Clerk's Office for the Western District of Washington; and

Plaintiff Monte Pringle ("Plaintiff" or "Pringle"), by and through his attorneys, brings this action individually and on behalf of all others similarly situated (the "Class" or "Plaintiffs"), against Defendants Evan R.L. Sutton ("Sutton"), Hannah Krieg ("Krieg"), Hannah Saunders ("Saunders") (Sutton, Krieg, and Saunders, collectively, are the "Individual Defendants"), Southend Indivisible Inc. ("SEI"), Seattle Indivisible ("SI") (SEI and SI, collectively are the "Funding Conduits"), The Open Society Foundation, and Proteus Fund, Inc. (The Open Society Foundation and Proteus Fund, Inc. are the "End U.S. Funders").

**INTRODUCTION**

1. This action seeks to hold accountable those who, by unlawful means, have deprived Washington construction tradespeople of employment and contracted work at data center project sites.

2. Historically, data center construction provided a steady and lucrative source of employment for a large number of workers in Washington State, including electricians like Pringle, as well as electrical and mechanical engineers, iron- and steel-workers, construction project managers, and many others. Once completed, the fully operational data centers likewise provide employment for a significant number of workers, including employees and executives of the data center companies, on-site and remote/on-call information technology consultants, food services and catering companies, cleaning and maintenance staff, and security providers, among others.

3. Plaintiffs' abilities to work in their historic and chosen fields of employment within the State of Washington have been, and on an ongoing basis continue to be, materially impaired and in many instances wholly thwarted by the unlawful activities that Defendants coordinated, funded, planned, and executed.[1]

4. Defendants have undertaken these tortious, and in many instances criminal, acts in a coordinated effort to impair – and ultimately halt – the ongoing operation, and new construction of Washington State data centers, as well as data centers across the entire United States.[2]

---

[1] To be clear, Plaintiffs do not seek to hold Defendants liable for engaging in protests, free speech, or other activities protected by the First Amendment. To the contrary, Plaintiffs seek to hold Defendants to account for their unlawful blocking of Plaintiffs' physical access to work locations, and interference with their rights to continue in their chosen professions.

[2] Although not the subject of this action, similar activities by some of the same Defendants, and others, have targeted other U.S. technology, infrastructure and defense businesses in Washington, as well.

5. Defendants pursue their objective through means that no constitutional provision protects. Plaintiff has personally observed and experienced on multiple occasions—and has learned from fellow union members and tradespeople of—specific examples of Defendants' misconduct, including entering secured private construction sites without permission, physically blocking the vehicle and pedestrian access to worksites during shift changes, and sending or causing to be sent communications to Plaintiff and other identified individual tradespeople that a reasonable recipient would understand as threats of violence.

6. Plaintiffs' claims arise from the unlawful means by which Defendants pursued that objective, and not from the objective itself or from any public statements in support of it.

7. Posing as "grassroots" community members, the Individual Defendants are, in fact, paid professional agitators with histories of unlawful extremist activities who directly, or indirectly through others, violate property laws; obstruct access to businesses and work sites; and promote threats of violence against those they associate with data centers.

8. The Individual Defendants have received compensation from the Funding Conduits to aid in their collective agenda to impair, thwart, and interfere with data center construction and operation in Washington.

9. For their part, the Funding Conduits have sought to mask the true sources of funding for the Individual Defendants and their activities, presenting them as local public interest sources.

10. Meanwhile, the End U.S. Funders have knowingly provided direct and indirect funding for these activities and have authorized, directed and ratified the illegal conduct discussed herein, funneling their funding through the Funding Conduits to obscure that the ultimate source of the funds are hostile foreign nation-states that seek to interfere with, and ultimately decimate, U.S. technology and security interests.

11. While the ultimate sources of the End U.S. Funders' monies dedicated to these unlawful efforts are not directly traceable through public sources—an intentional cover-up by the participants involved in this conspiracy—the recently announced investigative efforts by the U.S. Department of Justice and Internal Revenue Service point to at least partial Chinese government funding for such efforts.[3]

12. Plaintiffs bring this action to hold Defendants accountable for the financial damages they have caused to Plaintiffs through their intentional unlawful obstruction of Plaintiffs' rights to work in their historic and chosen professions within the State of Washington.

13. Plaintiff Pringle is just one of the hundreds, if not thousands, of individuals who have lost business and employment opportunities, many of whom reasonably perceived themselves to be personally and directly targeted by Defendants' actions in attacking the data center industry and any person who contributed to its construction, operation and maintenance.

14. Pringle has personally experienced and witnessed multiple incidents of Defendants' tortious conduct, and his fellow union members and tradespeople likewise have shared with him their personal experiences involving Defendants interfering with and harming their existing and future business opportunities.

15. Defendants' conduct, including impeding access of workers to data center construction projects and hindering access to business locations, directly and proximately caused the losses suffered by Plaintiffs.

[3] *See, e.g.*, https://thehill.com/opinion/national-security/6015467-china-ai-infrastructure-influence/; https://nypost.com/2026/02/03/us-news/grassroots-anti-ice-campaigns-funded-by-left-wing-billionaire-donors-sources/; https://nypost.com/2026/08/27/business/trump-admin-set-to-target-george-soros-nonprofit-in-tax-crackdown/; https://x.com/GlobalAffairs/status/2093130747796148634.

16. Plaintiffs make up a class of individuals who are, or were, employed at entities with interests in data center construction and operations, and who have suffered losses as a result of Defendants' tortious interference and other wrongful conduct.

17. Pringle and his fellow Class members have seen the violence associated with escalating anti-data center activities nationwide—including an Indianapolis City-County councilman who had thirteen bullets fired into his home and a threatening note saying "No Data Centers" left on his front porch. Other individuals that the anti-data center groups identified as enemies received death threats specifically tied to their support for data center developments.[4]

18. Defendants' proliferation of anti-data center activities instilled significant fear and anxiety in Pringle and others that they may be the next targets of physical violence as Defendants continue to foment hatred against data center employees across Washington State.

19. Pringle has suffered significant hardship, and substantial current financial losses, as a direct result of Defendants' actions, as well as harm to his long-term career due to Defendants' purposeful interference with employment opportunities, including but not limited to impeding access to construction project sites.

## I. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from at least one of the Defendants, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000.

[4] "Data Center Backlash Turns to Threats and Violence as Anger Spreads," NEWSWEEK, dated June 19, 2026 (accessible at https://www.newsweek.com/data-center-backlash-threats-violence-anger-spreads-12091889).

21. This Court has personal jurisdiction over the Individual Defendants because, upon information and belief, each is a resident of the State of Washington.

22. This Court has personal jurisdiction over SEI and SI because, upon information and belief, SEI and SI are organized under the laws of the State of Washington and maintain their principal places of business in Washington.

23. This Court also has personal jurisdiction over defendants Proteus, Open Society and ABC Corps. 1-100 because, upon information and belief, each such entity has transacted business in Washington State that is connected to the allegations herein, and/or has directed tortious conduct toward Washington State that has caused harm to Plaintiffs within the State.

24. Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because each Individual Defendant resides in this District, SEI and SI maintain their headquarters and principal places of business are located in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District.

## II. PARTIES

25. Plaintiff Monte Pringle is a resident of East Wenatchee, Washington. Pringle is an electrician and a member of the International Brotherhood of Electrical Workers Local 191 ("IBEW Local 191"). Pringle previously worked as a journeyman wireman for a major electrical contractor in Washington and worked on multiple data center construction projects. Since 2020, Pringle has served as an IBEW Regional Electrical Administrator. Pringle works with the Dispatch unit, and like other electricians in the union, receives dispatch assignments of varying lengths and complexity, ranging from several weeks to several months of work, typically at construction sites in the Western Washington area—including numerous data center construction projects. In the past several years, Pringle—like many other members of the Class—has had multiple work

opportunities on data center construction sites disappear at the last minute. As Pringle has been informed on multiple occasions—both directly from data center construction site managers, as well as fellow union members and tradespeople—data center owners and operators are curtailing operations in direct response to the hostile and threatening environment that Defendants have purposefully created, as well as Defendants' successful harassment, extortion, assault, and intimidation campaign that have caused new data center construction in Washington State to be drastically reduced—and stopped altogether in some areas. Pringle has personally witnessed this misconduct at more than one work site, and has learned from fellow union members and tradespeople of numerous other examples occurring throughout Washington State.

26. Upon information and belief, defendant Sutton resides in Seattle, Washington. Sutton is the founder, owner, and principal of Firekit Campaigns, a for-profit consulting firm through which Sutton sells campaign strategy, messaging, media, and "implementation" services to paying clients. Upon information and belief, Sutton was compensated by one or more clients for the anti-data-center campaign work described in this Complaint, marketed that work to prospective clients as a demonstration of Firekit Campaigns' capabilities. Sutton also holds a leadership role in the organization known as the TroubleMakers Community.

27. Upon information and belief, Saunders is a resident of Seattle, Washington. Saunders organizes and directs activities through her social media accounts and website, "Through the Static," which contain numerous posts dedicated to anti-data center rhetoric and condemning the companies that own and operate them. Plaintiff's claims against Saunders are not based on any article, post, or other work of journalism Krieg has published. They are based solely on Saunder's alleged participation in planning and directing the site entries and obstruction alleged below.

28. Upon information and belief, Krieg resides in Seattle, Washington. Krieg operates the website The Burner Seattle and associated social media accounts. Plaintiff's claims against Krieg are not based on any article, post, or other work of journalism Krieg has published. They are based solely on Krieg's alleged participation in planning and directing the site entries and obstruction alleged below.

29. Upon information and belief, SEI is a Washington non-profit corporation with a principal place of business located at 126 SW 148th Street, Suite C100-452, Burien, Washington.

30. Upon information and belief SI is a Washington non-profit corporation with a principal place of business at 2809 10th Avenue East, Seattle, Washington.

31. Upon information and belief, Proteus is a non-profit, IRS 501(c)(3) charitable organization organized under the laws of Massachusetts and with a principal place of business in Waltham, Massachusetts.

32. Upon information and belief, Open Society is a non-profit, IRS 501(c)(3) charitable organization organized under the laws of New York, with a principal place of business in New York, New York.

33. Defendants ABC Corps. 1-100 are entities as yet unknown to Plaintiffs who conspired with the Defendants and aided and abetted the tortious conduct that occurred in this District, including, inter alia, channeling foreign funds to the Individual Defendants, SEI and SI with the intent of harming Plaintiffs in this District.

//

//

//

## III. GENERAL FACTUAL ALLEGATIONS

### A. Data Centers Serve as the Infrastructure of the Modern Economy

34. Data centers enable the services upon which all Americans rely in their daily lives, including email, text messaging, video calls, internet access, and social media. Such services would not be possible without the data centers that are responsible for hosting the technology that processes, stores, and transfers the data that makes these services function.

35. Remote and hybrid work, an employment revolution that has changed millions of lives by saving commuting time and costs and increasing quality of life, is made possible by data centers. The tools that support working from home, including video conferencing, virtual private networks ("VPNs"), and cloud computing, are all hosted on physical servers located in data centers.

36. The data center industry is a significant and growing driver of economic prosperity in communities across the United States. According to the U.S. Census Bureau's Quarterly Workforce Indicators ("QWI"), employment in U.S. data centers increased more than 60% nationally from 2016 to 2023.[5] In fact, between 2016 and 2023, the number of people working in data centers grew from 306,000 to 501,000.[6] A 2025 report prepared by PricewaterhouseCoopers ("PwC") found that, "[f]rom 2017 to 2023, direct employment in the U.S. data center industry expanded by over 50 percent, compared to 10 percent growth in employment for the United States overall during the same timeframe."[7]

---

[5] Andrew Foote et al., *Employment in Data Centers Increased by More than 60% From 2016 to 2023 But Growth Was Uneven Across the United States*, UNITED STATES CENSUS BUREAU (Jan. 6, 2025), https://www.census.gov/library/stories/2025/01/data-centers.html.

[6] *Id.*

[7] *Economic Distributions of Data Centers in the United States 2017-2023*, PWC (Feb. 2025) https://static1.squarespace.com/static/63a4849eab1c756a1d3e97b1/t/67b38f78e9cf125daf756112/1739820925392 / Data+Center+Economic+Contribution+Study+2025_Final.pdf (the "PwC Report").

With each job that data centers provide, such employment supports over six additional jobs in the larger economy, highlighting the critical role that data centers play in job creation and "economic stimulation across sectors," including construction, maintenance, and security.[8]

37. Not only do data centers substantially support employment rates across sectors, but the wages paid to data center workers are also substantial and contribute meaningfully to state and local economies. By the time they complete their training, journeyman electricians earn about $59.50 an hour—more than $120,000 a year—plus benefits that often include health insurance and a pension. Add in overtime hours, or being a foreman, and electricians can make closer to $200,000 a year. Data center construction alone generates well-paying jobs for technicians and other local trade workers. Data center construction spending increased 23% year-over-year in May 2026, making data centers one of the fastest-growing segments of nonresidential construction.[9]

38. Beyond employment, data centers generate substantial tax revenues that play a crucial role in supporting public programs. In 2023, the data center industry's total contribution to government revenues at federal, state, and local levels was $162.7 billion, representing an increase of 146% over the previous six years.[10] At the federal level, the data center industry's revenue contributes to broad government initiatives and at the state and local levels, and helps finance services like public education, infrastructure maintenance, and public health services.[11] In 2023 in Washington, at least 29,000 jobs were directly attributable to the data center industry and data centers generated approximately $4 million in labor income.[12] Additionally, the assessed value of data centers has enabled Washington residents to pay less in property taxes and has allowed communities to revamp

---

[8] *Id.*
[9] *Data Centers Build More than Technology*, AGC https://www.agc.org/sites/default/files/users/user21902/Data%20Center%20Benefits_0707.pdf.
[10] PwC Report at 7.
[11] *Id.*
[12] *Id.*

their infrastructure.[13] For example, the City of Quincy, Washington was able to replace, upgrade, and construct critical infrastructure, including building a new high school and replacing wastewater systems.[14]

39. Data centers represent not merely industrial facilities, but critical infrastructure upon which the modern economy, and the daily lives of millions of Americans, depends.

40. Many of the world's top financial, technology, media, and healthcare companies, as well as government entities throughout the United States, rely on the critical infrastructure that data centers provide.

41. Data centers are not only critical to major companies' operations, but they also provide life-saving services to underserved communities throughout America. For example, many virtual healthcare providers—which provide immediate access to medical consultations for Americans who might otherwise not be within accessible distance of a doctor's office or whose medical conditions make traveling impractical or impossible—rely on data centers to support their video streaming services.

42. Likewise, many online educational platforms that allow for remote learning, support literacy and aid in childhood development require the services that data centers provide. A child in a rural town thus has access to world-class learning institutions on a global level thanks to the technological opportunities that data centers create.

43. The benefits that data centers provide reach every sector of American lives and represent a prime opportunity for bringing equity to low- and middle-income families.

---

[13] *Data Center Workgroup: Preliminary Report*, Department of Revenue Washington State (Dec. 1, 2025) https://dor.wa.gov/sites/default/files/2025-12/2025DataCntrWrkgrpPrelimReport.pdf.

[14] *Id.*

**B. Defendants coordinate efforts to physically disrupt data center development and operation in this District.**

44. The opposition to data center development, as well as U.S. National Defense contractors' and American technology companies' businesses, in the Seattle, Washington area has been driven by paid professional agitators (the Individual Defendants), funded by seemingly local charities (the Funding Conduits), and from there by national charities (the End U.S. Funders) that are being actively investigated by the U.S. Department of Justice and the Internal Revenue Service for their possible links to the Chinese Communist Party, which is engaged in ongoing efforts to undermine the U.S. data center, technology and defense industries.[15]

**1. TroubleMakers Community, SEI and SI**

45. Central among the relevant organizations targeting the Seattle, Washington area, the Funding Conduits consist of (i) an organization known as "TroubleMakers Community" ("TroubleMakers"),[16] a Seattle-based activist organization co-founded by Valerie Costa in 2023;[17] and (ii) SEI and SI, which are local chapters of the national Indivisible Movement.

46. TroubleMakers, SEI and SI are working together on a coordinated campaign against data centers, U.S. technology companies, and defense contractors in the Seattle, Washington area with the financial support, and at the behest and direction of, the End U.S. Funders, who not only are aware of the activities in which Troublemakers, SEI, and SI are engaged, but have actively encouraged and ratified such conduct.

---

[15] *See, e.g.*, https://nypost.com/2026/02/03/us-news/grassroots-anti-ice-campaigns-funded-by-left-wing-billionaire-donors-sources/; https://thehill.com/opinion/national-security/6015467-china-ai-infrastructure-influence/; and https://nypost.com/2026/08/27/business/trump-admin-set-to-target-george-soros-nonprofit-in-tax-crackdown/ .

[16] "TroubleMakers" is not named as a defendant herein only because Plaintiff has been unable to identify it in any public record as any variety of legal entity. Rather, it appears to simply be used as a *nom de guerre* or organizing banner head for defendant Sutton.

[17] TroubleMakers, Influence Watch, https://www.influencewatch.org/organization/troublemakers/.

47. TroubleMakers co-sponsored, and SEI and SI encouraged their members to participate in, a campaign hosted on Action Network titled “No New Data Centers in Seattle,” which asked the Seattle City Council and the Mayor to impose a moratorium on data center construction. Approximately 100,000 letters were sent through that campaign.[18]

48. TroubleMakers’ core committee member, defendant Sutton, served as the public face of the anti-data center campaign and played an integral role in organizing and directing anti-data center activities, such as those alleged herein.

49. The use of popular influencers, such as Sutton and others, as the public face of the campaign was an intentional choice by those in control of the scheme to appeal to a wider audience and to appear to humanize the issues, all while hiding the true source of their funding and the ultimate goals of decimating the U.S. data center industry—and depriving workers like Pringle of employment—to advance foreign national interests.

50. Sutton further stated publicly that TroubleMakers intended to keep the pressure on elected officials, making clear that the campaign was designed to escalate until data center development was halted entirely—an outcome that would cripple the businesses of numerous U.S. National Defense contractors and American technology companies, in addition to depriving Plaintiffs of ongoing employment and employment opportunities in connection with the construction, operation and maintenance of data centers in the region.

51. SI has played a leading role in planning and promoting large, concerted actions at data centers in the Seattle area that unlawfully impeded access to private property, data center construction and/or operations, including at least one such unlawful blocking of access to a facility where

[18] This paragraph is pleaded as background and as evidence of coordination among Defendants. Plaintiff does not seek to impose liability on Defendants for their participation in this campaign.

Pringle had a contract for electrical work, resulting in cancellation of that contract, and others that Pringle has learned of from fellow union members and tradespeople.

**2. Defendants coordinated their conduct to threaten and intimidate Plaintiffs, placing them in reasonable fear for their safety, and interfering with their employment.**

52. In addition to leading TroubleMakers, Sutton frequently posts content to his tens of thousands of followers on his social media platforms, such as Instagram. Sutton advocates for Defendants' anti-data center objective by fomenting interference with the construction and operation of data centers, thereby interfering with Plaintiffs' actual and prospective employment.

53. Saunders founded and is the lead contributor to "Through the Static," and directs the coordinated campaign's messaging through that website and an associated social media account with approximately 36,700 followers. Saunders used those channels to encourage followers to disrupt the development and operation of data centers through unlawful trespasses and obstructive actions that block employees' and contractors' physical access to these companies and facilities, thereby shutting down construction projects.

54. Krieg and the other Individual Defendants, along with SEI, and SI, participated in planning the conduct alleged below.

55. The Individual Defendants also frequently cross-post each other's content on their respective social media platforms and websites, and encourage their followers to share and repost their content, resulting in the amplification their coordinated messaging and furthering their conspiracy.

56. The Individual Defendants coordinated the timing and content of their public statements with one another and with SEI, SI, and TroubleMakers—further evidence of the agreement alleged in the Third Cause of Action below.

57. Pringle first learned of Defendants’ campaign after being told that several of his dispatch assignments had been canceled.

58. For example, on June 16, 2025, Pringle was dispatched to work for Veca Electric on a Microsoft data center construction project in Malaga, Washington. However, before work could commence, Pringle received a call from a representative of Veca Electric informing him that his services would not be needed as the project was being placed on hold, or possibly scrapped, due to the repeated unlawful entries onto the premises, physical blocking of workers’ access and threats of violence made by and at the direction of Defendants Sutton, Krieg and Saunders. This assignment was expected to last up to a year.

59. As another example, on September 19, 2025, the general foreman for Prime Electric told Pringle that H5 was terminating his data center construction assignment—which involved the next phase of the installation and calibration of power distribution units on site—because of Defendants Sutton, Krieg and Saunders’—and/or those acting on their behalf—direct and directed conduct at the site several days earlier. This conduct included attempts at sabotage at the construction site and physical blocking ingress and egress to the main entry of the site, as described below.

60. Upon information and belief, each of the Individual Defendants received, and continue to receive, ongoing payments from each of the Funding Conduits; who in turn received, and continue to receive, ongoing payments from the End U.S. Funders.

61. The End U.S. Funders’ funding was directly tied to, and in support of, the trespass and unlawful interference activities alleged herein, and occurred over a substantial period of time in multiple rounds of payment.

**3. Defendants engaged in targeted and unprotected conduct at Washington data center sites.**

62. Defendants' conduct has targeted multiple data center operators in Washington State. These companies operate millions of square feet of mission-critical data center space and manage many hundreds of megawatts of critical capacity.

63. The Individual Defendants also have appeared at and impeded access to data center construction sites in Washington State and/or directed others to do so in furtherance of their goals.

64. Pringle has personally witnessed and/or learned from fellow union members and tradespeople of several incidents in which one or more of the Individual Defendants, and/or those acting at their direction, committed crimes and/or civil violations of applicable law through actions wholly unprotected by the United States and Washington State Constitutions.

65. For example, on September 8, 2025, while Pringle was attempting to access the H5 data center construction site, Defendants Sutton, Krieg and Saunders, and/or persons acting at each of their direction, entered the secured construction site without permission and after being instructed to leave, in violation of RCW 9A.52.080.

66. Even after leaving the secured areas of the H5 data center construction site on September 8, 2025, Defendants Sutton, Krieg and Saunders, and/or those acting at their direction, physically blocked the vehicle and pedestrian entrance to the site at or around 7:00 a.m., preventing Pringle and other tradespeople from reaching their assigned work.

67. As noted above, Pringle's contract to provide electrical engineering services on the H5 project were terminated as a result of Defendants' conduct.

### 4. Defendants' Conduct Inflicted Harm on Plaintiffs.

68. Defendants' conduct caused Pringle and other Plaintiffs to (1) reasonably perceive risks of violence by the Individual Defendants and/or their activist followers and co-conspirators; and (2) lose existing and future employment opportunities. Pringle further viewed Defendants' actions as creating a hostile and intimidating work and personal environment due to his fear for his and his family's safety simply for showing up to his place of work, where he was forced to encounter agitators, endure verbal confrontations, and navigate crowds of demonstrators simply to access his place of employment.

69. The conduct of Defendants and/or those acting at their direction at the sites identified above prevented Pringle and other tradespeople from performing work they had been dispatched to perform.

70. The cumulative effect of Defendants' hostile campaign against Pringle, Plaintiffs and overall data center development—and by extension, against U.S. National Defense contractors and American technology companies' operations—has caused tangible harm to Plaintiffs.

71. Defendants conspired to create a hostile and threatening environment for Pringle and other Class members in their communities and at work, causing them not only to lose valuable construction and operations work opportunities, but also to be demonized in their communities by the Defendants' malicious conduct. Pringle fears for his safety and well-being as a direct result of Defendants' personal and targeted harassment, which has fomented anger and violence against those associated with data center construction and operation.

72. Similarly, as Pringle has personally experienced, and heard from fellow union members and other tradespeople, the campaigns caused harm to data center construction and operation employees, vendors and consultants who provide services to the data center companies by depriving them of business and employment opportunities and interfering with existing and future contracts due to the harassment and efforts to shut down further data center development in Washington State.

73. As a direct and proximate result of Defendants' tortious acts, data center companies—and other lawful, national security-critical businesses—have curtailed or stopped construction on many new projects, and employment and business opportunities for individuals like Pringle have disappeared.

74. Pringle, for example, lost multiple long-term work opportunities on data center construction projects in the last three years and has suffered from the loss of new work opportunities due to the drastic scaling back of data center construction work that has resulted from Defendants' conduct.

75. Pringle is an experienced electrician who has previously worked on data center construction projects, but those opportunities have disappeared—often being cancelled at the last minute.

76. As part of the Dispatch unit with the IBEW, Pringle's work as an electrician is dependent on new projects coming in on a regular basis. On numerous occasions in the past few years, new electrical projects associated with data center construction have come in through Dispatch, and were canceled before work could commence or shortly after Pringle arrived on the job. The canceled job work was a direct and proximate result of Defendants' conduct. The few data center projects that have survived through commencement are extremely limited as compared

to prior to Defendants' campaign proliferating. Pringle has suffered the loss of multiple job opportunities and significant income, as a result.

77. By way of example, in 2025, Pringle was dispatched to work for Cupertino Electric at the H5 Data Center construction project in Quincy, WA. After less than three weeks, he and his fellow IBEW members were let go and told the reason was adverse impacts of efforts by the Individual Defendants, and/or others acting at the direction of Individual Defendants, to disrupt the operation of the business and the business's ability to sustain new projects—including what Pringle and his crew were working on—through unlawful entries onto the premises and threats of violence. Pringle suffered personal losses of at least $40,000 from the early termination of the project, which Pringle expected to include at least four months of work with overtime. The Individual Defendants took these actions knowing—and with the full intention—that they would (1) influence data center operators and owners to halt construction projects and abandon plans for forthcoming new centers; and (2) cause harm to contractors and employees, such as Pringle, whose jobs would be terminated and future employment opportunities would disappear as a result of Defendants' conduct.

78. Similarly, at the start of 2026, Pringle was dispatched with other IBEW Local 191 members to a contract with North Point Electric in Seattle. The contract was terminated for the entire crew after approximately three weeks due to the conduct of Defendants.

79. Furthermore, as noted above, Pringle's work at the Microsoft data center construction site in Malaga, Washington was terminated early, and Pringle was told by Veca Electric that the early termination was due to Defendants' misconduct and interference. Pringle lost a full year of work and compensation of at least $160,000 due to the early termination.

80. TroubleMakers', SEI's and SI's campaigns contributed to a chilling effect on data center employment in the Seattle area, deterring qualified workers from maintaining employment with data center operators and depriving them of opportunities for employment at several data centers that were in the active planning stages but have since been withdrawn entirely or put on hold.

81. Defendants' conduct is ongoing.

**C. Defendants' funding sources.**

82. Defendants' activities are funded, at least in part, by several deep pockets whose goal is to hinder and harm the American technology industry.

83. U.S. data centers are critical infrastructure that play a central role in the battle between the U.S. and the People's Republic of China for global technological dominance.

84. Technological espionage through the placement and recruitment of inside operatives has already been discovered in multiple data centers and technology companies in the Pacific Northwest technology industry.

85. This network of operatives has sought to steal proprietary and highly sensitive technology for use overseas, and to generally harm U.S. financial, government, military, and industrial interests. In doing so, they have attempted to gain access to some of the most sensitive technology and information that flows through the U.S. data centers, including but not limited to satellite imagery, space-business intelligence, real-time traffic data, and home security system and surveillance hardware.

86. In addition to seeking to gain inside access through improper means, operatives simultaneously have sought to set back new data center construction and expansion projects throughout the country in order to suppress U.S. technological dominance.

87. Recently, X (formerly known as Twitter) revealed that its internal investigation had uncovered a Chinese bot farm operating more than 200,000 accounts, including 200 specifically dedicated to spreading misinformation about U.S. data centers and attempting to weaponize and manipulate public opinion against data center development.[19]

88. Furthermore, in an attempt to disguise the true source of the funds, these actors have channeled millions of U.S. dollars through various U.S.-based tax-exempt, not-for-profit corporations, with the goal of further distributing those funds to regional activist groups for the express purpose of supporting unlawful activities, including disrupting new data center construction and expansion.

89. A recent report by the American Energy Institute found that at least $39 million in foreign funding has been funneled through multiple U.S. non-profits associated with anti-data center activities.[20] Upon information and belief, that number is merely a drop in the bucket of the larger scheme by foreign influences to fund these anti-data center activities.

90. Similarly, earlier this year, the Bitcoin Policy Institute issued an investigative report detailing how international actors, such as the PRC, are funding dark money through nonprofit networks and using their influence to control the actions of local, grassroots organizations. The ultimate goal of this campaign is to shape U.S. policy and public opinion, including regarding data center expansion and development.[21]

---

[19] https://x.com/GlobalAffairs/status/2093130747796148634

[20] "Foreign-Funded Opposition to U.S. Data Center Expansion" (April 2026) https://americanenergyinstitute.com/docs/aei_data-center_report_v2.pdf

[21] "Foreign Influence in the Campaign against American AI," (May 18, 2026) https://www.btcpolicy.org/articles/foreign-influence-in-the-campaign-against-american-ai.

91. Upon information and belief, two such organizations that served as conduits for foreign funding supporting the Individual and Funding Conduits' trespass and unlawful actions are Proteus and Open Society.

92. Proteus is a purported philanthropy organization that was founded in 1994. It directs financial funding to activists and demonstrators, and encourages extreme conduct as part of its central mission. It advertises its main goals as including "promoting narrative change as a critical strategy for victory by resourcing effective narrative development work," "encouraging . . . risk-taking" and "support[ing] bold strategies" by the movement leaders that it funds.

93. Proteus transfers funds both directly to organizations and individuals—such as SEI, SI and the Individual Defendants here—and indirectly through its "Piper Fund Initiative" and/or other affiliated entities that devote resources to "grassroots" organizations throughout the United States.

94. Open Society holds itself out as a philanthropic foundation that makes grants to advocacy organizations.

95. Open Society is one of the key funders of the Indivisible Project—the national chapter for defendants SEI and SI—having donated more than $7.6 million since 2017. Indivisible Project has been linked to anti-data center activities, demonstrations, and unlawful trespass conduct throughout the United States. Open Society shares overlapping board members with Indivisible Project, as well.

96. Recently, the U.S. Department of Justice and the Internal Revenue Service announced investigations of Open Society, including as to its sources of foreign funding and possible ties to political violence.[22]

[22] https://nypost.com/2026/08/27/business/trump-admin-set-to-target-george-soros-nonprofit-in-tax-crackdown/

97. The Defendants here are not unwitting pawns in a larger scheme—they have had knowledge of the true source of their funding and have conspired and acted in concert with these entities and organizations with the intent to harm Plaintiffs and other class members by shutting down data center businesses that employ them and/or from which Plaintiffs have derived financial benefits through vendor agreements and consulting projects, among other means.

## CLASS ACTION ALLEGATIONS

98. Plaintiffs bring this action individually and on behalf of a class of similarly situated individuals pursuant to Rule 23 of the Federal Rules of Civil Procedure.

99. Plaintiff seeks to represent the following Class:

   a. All persons who, between October 30, 2023 and the present, were dispatched or hired to perform construction, operations, or maintenance work at a data center project site in the State of Washington and whose assignment or engagement at such a site was terminated, canceled, or not commenced.

100. Excluded from the Class are Defendants, their officers, directors, employees, and affiliates, any judicial officer assigned to this matter and the immediate family of any such judicial officer, and any person who timely elects to be excluded from the Class.

101. Plaintiffs reserve the right to further amend or modify the Class definition in connection with their motion for class certification, as a result of discovery, at trial, or as otherwise allowed by law.

### A. Numerosity

102. The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class includes at least 500 persons, based on the approximately 1,500 members of the IBEW Local 191 alone—and not including the sister local unions and

other crafts that were dispatched to the Washington State data center projects from October 30, 2023 to present.

103. The identity of Class members can be determined from the dispatch records of IBEW Local 191 and other referring unions and from the payroll and assignment records of the contractors that staffed data center projects in Washington.

**B. Commonality**

104. There are questions of law and fact common to the Class. Each question below is capable of resolution on evidence common to the Class and its answer will not vary from member to member:

a. Whether Defendants, or persons acting at their direction, entered secured data center construction sites in Washington without permission, and whether they physically obstructed worker access to those sites;

b. Whether Defendants intended that their unlawful trespass activities would cause data center operators and owners to terminate ongoing construction and cause them to abandon future plans for data center construction in Washington State;

c. Whether Defendants were aware the Plaintiffs had contracts for employment, or prospective business expectancies, with the data center construction projects at which they appeared, or directed others to appear, and obstructed access;

d. Whether Defendants' conduct was a substantial factor in causing lost income, lost revenue, and other economic harm to Plaintiffs arising from the disruption of their employment relationships;

e. Whether Defendants and their co-conspirators agreed to obstruct data center construction in Washington by the unlawful means alleged above.

**C. Typicality**

105. Pringle's claims are typical of the claims of the Class. Pringle was dispatched to perform electrical work at Washington data center project sites, his assignments were terminated before their expected completion, and he alleges the same conduct by the same Defendants

under the same legal theories as every other Class member. Pringle has no claim, defense, or interest that differs materially from those of the Class.

**D. Adequacy of Representation**

106. Plaintiff will fairly and adequately represent and protect the interests of the Class. Pringle interests are aligned with, and not antagonistic to, those of the other Class members; Pringle has no conflict of interest with any Class member; and Plaintiff has retained counsel competent and experienced in complex class litigation.

107. Pringle's counsel are experienced in class litigation and in complex commercial litigation, have identified and investigated the claims asserted here, are knowledgeable in the applicable law, and will commit resources sufficient to represent the Class.

**E. Superiority of Class Action**

108. A class action is superior to other available means for the fair and efficient adjudication of the controversy. Individual joinder of Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

109. Predominance. The questions of law and fact common to the Class predominate over any questions affecting only individual members. Defendants' liability turns on a single course of conduct between and among the Defendants, proof of which is common to every Class member.

110. Damages are capable of measurement on a Class-wide basis by a formula tied to the theory of liability: for each terminated or canceled assignment, the contracted or expected hours not worked, multiplied by the applicable collectively bargained wage and benefit rate, with offsets for substitute dispatches actually worked.

111. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class members have limited interest in individually controlling separate actions given the cost of proving a coordinated course of conduct; Plaintiff is aware of no other litigation concerning this controversy already begun by Class members; this District is the desirable forum because the conduct and the injuries occurred here and most Class members reside here; and the action presents no unusual management difficulties because Class membership and damages can be determined from union dispatch records and contractor payroll records.

112. In the alternative, and to the extent the Court determines that individual questions preclude certification of the claims as a whole, Plaintiff seeks certification under Rule 23(c)(4) of the particular issues common to the Class, including whether Defendants engaged in the conduct alleged, whether that conduct was undertaken pursuant to an agreement, and whether it constitutes improper means under Washington law.

## FIRST CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH CONTRACT

113. Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

114. Plaintiffs and the IBEW entered into contracts with, among others, Cupertino Electric, North Point Electric and Veca Electric, pursuant to which Pringle and other IBEW members would provide services in exchange for compensation, including overtime (the "Contracts").

115. Defendants were aware of the Contracts and of Plaintiffs' expected benefits. Defendants had knowledge of the Contracts prior to appearing at the data center construction sites where they unlawfully interfered with business operations, and/or prior to directing others to carry out the unlawful conduct. However, at a minimum, upon arriving at the data center construction sites,

and prior to commencing their tortious conduct, the Individual Defendants and/or those acting at their direction—all of whom were acting as part of the enterprise and at the direction and authorization of the Funding Conduits and the End U.S. Funders—encountered members of the IBEW and became aware that the IBEW and its members had been hired to provide electrical work on the sites.

116. Defendants' tortious conduct—including physically obstructing access to the construction sites, issuing threats of violence and/or encouraging others to commit such misconduct—directly and proximately caused the counterparties to the Contracts (Cupertino Electric, Northpoint Electric and Veca Electric, among others) to terminate the Contracts early. Indeed, representatives of the counterparties confirmed to Pringle that Defendants' conduct was the cause of the early terminations.

117. As a result of Defendants' tortious conduct, Plaintiffs were damaged through the loss of compensation and expected overtime they would have received had the Contracts been allowed to continue until completion.

**<u>SECOND CAUSE OF ACTION</u>**
**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**

118. Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

119. At all relevant times, Plaintiffs derived economic benefits from multiple data center companies in Washington State who were in an expansion phase and announced plans to build multiple new data centers in the state from 2023 onward. For example, Amazon and Microsoft, among others, intended to build new centers. Pringle and Plaintiffs and had a reasonable expectation of continued and future economic benefits from these companies. By way of specific examples, Pringle had a reasonable expectation of continued and further economic benefits from the H5 Data Center construction project in Quincy, WA and with North Point Electric at its data center construction project.

120. Defendants knew of those business expectancies. Defendants further knew that construction at the sites they targeted was performed by tradespeople dispatched under union agreements.

121. Defendants' interference was accomplished by improper means. Each means alleged above is wrongful independent of its effect on Plaintiff's contractual relationships: entry onto a secured construction site after being instructed to leave is criminal trespass; physical obstruction of a worksite entrance is unlawful obstruction; and a communication that a reasonable recipient would understand as a threat of violence against an identified person is not protected expression.

122. The obstruction alleged above prevented Pringle and other tradespeople from reaching their assigned work from approximately October 30, 2023 to present, causing the loss of hundreds of hours of paid work for Pringle alone.

123. Pringle does not rely, for any element of this claim, on Defendants' advocacy, their published statements of opinion about data centers, their communications to public officials, or their participation in lawful assembly. Those matters are pleaded as evidence of Defendants' knowledge, agreement, and intent only.

124. Defendants either intended to disrupt Plaintiffs' employment relationships through the conduct alleged herein, or knew that their conduct was substantially certain to do so.

125. As a direct and proximate result of Defendants' tortious interference, Plaintiffs have suffered and continue to suffer damages, including but not limited to lost income.

126. Pringle lost the assignments identified above, together with the wages and benefits he would have earned had those assignments run to their expected duration, in an amount of not less than $200,000.

127. Defendants’ conduct was a substantial factor in causing the harm to Plaintiffs described herein.

128. Defendants’ wrongful conduct is ongoing and continuing, and Plaintiffs face future harm as a result of Defendants’ sustained campaign of interference with Plaintiffs’ business relationships and operations.

129. As a result of the above conduct, Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## <u>THIRD CAUSE OF ACTION</u>
## CIVIL CONSPIRACY

130. Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

131. Defendants and their co-conspirators, and other individuals and organizations known and unknown, entered into an agreement, combination, or common understanding to engage in a coordinated campaign to obstruct data center development and operations, damage the reputation of the data center industry and cause harm to U.S. National Defense contractors and technology companies with business interests in this District.

132. In furtherance of the agreement, Defendants committed the overt acts alleged above, including entry onto secured construction sites without permission, physical obstruction of worker access to those sites, and threatening communications directed to identified tradespeople.

133. The object of the agreement, and the means by which Defendants pursued it, were independently unlawful as alleged in the First and Second Causes of Action.

134. As a direct and proximate result of the conspiracy, Plaintiffs have suffered and continue to suffer damages, including but not limited to lost income.

135. Defendants are jointly and severally liable, along with their co-conspirators, for this conspiratorial conduct and the resulting harm suffered by Plaintiffs.

136. Defendants' conspiratorial conduct is ongoing and continuing, and Plaintiffs face future harm as a result of Defendants' sustained and coordinated campaign.

137. As a result of the above conduct, Defendants are liable to Plaintiffs for damages in an amount to be determined at trial.

## <u>FOURTH CAUSE OF ACTION</u>

## AIDING AND ABETTING TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

138. Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

139. As alleged in the First and Second Causes of Action, Defendants SEI, SI, and the Individual Defendants tortiously interfered with Plaintiff's business expectancies and existing contracts.

140. Each Defendant knowingly and substantially assisted and encouraged the other Defendants in carrying out the tortious interference with Plaintiffs' existing and prospective employment relationships. Specifically, each such Defendant had actual knowledge of the underlying tortious interference and provided substantial assistance by, among other things: providing financial funding to SEI and the Individual Defendants in support of the bad faith activity, coordinating with other Defendants to organize anti-data center demonstrations that blocked and impeded Pringle and others form accessing work sites; providing logistical, organizational,

and promotional support for anti-data center actions designed to disrupt business operations; and using encrypted communications platforms to plan escalating activities directed at data center corporations and its employees.

141. Each aiding and abetting Defendant's participation was a substantial factor in bringing about the tortious interference with Plaintiffs' employment relationships. But for the substantial assistance provided by each such Defendant, the tortious interference described in Counts One and Two would not have occurred, or would not have been as effective.

142. Each aiding and abetting Defendant acted with the knowledge and intent that their assistance would facilitate the disruption of Plaintiffs' employment, or knew that such disruption was substantially certain to result from the conduct they assisted and encouraged.

143. As a direct and proximate result of Defendants' aiding and abetting of the tortious interference with Plaintiffs' employment relationships and business expectancies, Plaintiffs have suffered and continue to suffer damages, including but not limited to lost income.

144. Defendants' aiding and abetting conduct is ongoing and continuing, and Plaintiffs face future harm as a result of Defendants' sustained assistance to and encouragement of the campaign of interference with Plaintiffs' employment relationships.

145. As a result of the above conduct, Defendants are jointly and severally liable to Plaintiffs for damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

a. Certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3); appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel; and directing appropriate notice to the Class;

b. Awarding compensatory and consequential damages in an amount to be proven at trial, together with such other damages as are authorized by law, and attorneys' fees and costs where authorized by law;

c. Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

146. Plaintiffs hereby demand a trial by jury.

*Respectfully submitted this 4th day of November, 2026.*

**CHUNG, MALHAS & MANTEL, PLLC:**

/s/ Edward Chung
Edward C. Chung, WSBA 34292
1037 NE 65th Street Suite 80171
Seattle, Washington 98115
Phone: (206) 264-8999
Facsimile: (206) 264-9098
*Local Counsel for Plaintiff(s)*

**IMPRESA LEGAL GROUP:**

George Kostel, Esq. (*pro hac vice admission forthcoming*)
Rich Kelsey, Esq. (*pro hac vice admission forthcoming*)
3101 Wilson Blvd., Ste. 500
Arlington, VA 22201
Tel.: (703) 842-0660
*Counsel for Plaintiffs*